UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SALT CITY STEEL LLC,<br><br>    PLAINTIFF,<br><br>v.<br><br>THE PARTNERSHIPS IDENTIFIED ON SCHEDULE A,<br><br>    DEFENDANTS. | CASE NO.: 1:25-cv-12712<br><br>JUDGE ANDREA R. WOOD<br><br>MAGISTRATE JUDGE MARIA VALDEZ |

## DECLARATION OF WESTON SPENCER

I, Weston Spencer, declare and state as follows:

1. This declaration is based upon my personal knowledge of the facts stated herein, or on the business records that were made at the time, or in the regular course of business. If called as a witness, I could and would testify to the statements made herein.

2. I am the Owner of Salt City Steel LLC ("SCS" or "Plaintiff"). I am knowledgeable about or have access to business records concerning the brand protection operation of SCS, including its copyrights, sales, advertising, marketing, media coverage, and associated international operations. I make this declaration regarding matters within my own knowledge save where otherwise stated.

3. Founded in 2007, Salt City Steel LLC is a limited liability company with its primary offices located at 319 Fenton Ave., South Salt Lake City, Utah, 84115.

4. Salt City Steel LLC is a small family owned metal fabrication business and is the only official manufacturer and retailer of an innovative equal spacing layout tool designed for

ornamental iron fabrication, called the "Picket Master Pro" (the "PM Products"). This tool streamlines the layout of picket spacing for gates, railings, fences, and stitch welds, enhancing efficiency and precision in metalworking projects. Each PM Product is meticulously handcrafted by the Plaintiff, in South Salt Lake, Utah, ensuring top-notch quality and durability. The PM Products have become a staple in SCS shop and many other shops all over the world.

5. SCS is the copyright holder and owner of certain federally registered copyrights covering the Picket Master Pro photographs (collectively, the "PM Copyrights"). True and correct copies of the copyright registrations are attached as **Exhibit 1**.

6. SCS owns the exclusive rights to develop, manufacture, distribute, license, sell, promote and otherwise use goods and services of every kind and nature based upon or derived from the PM Copyrights throughout the world in perpetuity.

7. SCS has expended significant time, energy, money, and resources into promoting PM Products featuring PM Copyrights. As such, the recognition and goodwill associated with the PM Products, and PM Copyrights are of incalculable and inestimable value to the Plaintiff.

8. Plaintiff employs direct-to-consumer marketing and distribution strategy, using its website, https://www.saltcitysteel.org. They also leverage social media platforms like TikTok and Instagram, to market their products.

9. PM Products are manufactured to a high-quality standard, using high-quality materials.

10. The success of PM Products has resulted in significant infringement. Consequently Plaintiff has implemented an anti-counterfeiting program and identified numerous online marketplace accounts and ecommerce stores linked to fully interactive websites and marketplace

listings on various platforms, including the Internet stores operating under the online marketplace accounts identified on Schedule A (collectively, the "Defendant Internet Stores" or "Seller Aliases"), which are offering for sale, selling, and importing infringing products in connection with the PM Copyrights (referred to herein as the "Infringing Products") to consumers in this Judicial District and throughout the United States. Despite Plaintiff's enforcement efforts online, Defendants have persisted in creating the Defendant Internet Stores.

11. Plaintiff receives approximately ten (10) emails every week from customers who purchased low-quality Infringing Products, expressing their dissatisfaction with the poor quality and delayed shipping times associated with the Infringing Products, as well as their confusion between the Infringing Products and Plaintiff's genuine PM Products. These emails only reflect those consumers who took the time to reach out, meaning the actual number of confused and dissatisfied consumers is likely significantly higher.

12. Plaintiff has not authorized the individuals and entities operating the Defendant Internet Stores (referred to herein as the "Defendants") to use the PM Copyrights, nor has it authorized the Defendants as licensees or resellers of PM Products.

13. I perform, supervise, and/or direct investigations related to Internet-based infringement of PM Copyrights. Our investigation shows that Defendants are using the Defendant Internet Stores to sell Infringing Products from foreign countries such as China to consumers in the U.S. and elsewhere. I, or someone working under my direction, analyzed each of the Defendant Internet Stores and determined that Infringing Products were being offered for sale to the United States, including Illinois. This conclusion was reached through visual inspection of the products listed for sale, the price at which Infringing Products were offered for sale, other features commonly

associated with websites selling Infringing Products, because Defendants offered shipping to the United States, including Illinois, and because Defendants and their websites do not conduct business with Plaintiff, and do not have the right or authority to use the PM Copyrights for any reason. True and correct copies of screenshot printouts showing the active Defendant Internet Stores reviewed are attached as **Exhibit 2.**

14. Upon information and belief, Defendants facilitate sales by designing the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers selling genuine PM Products. Many of the Defendant Internet Stores look sophisticated and accept payment in U.S. dollars via credit cards, and/or through multiple payment processor and merchant accounts.

15. Defendants go to great lengths to conceal their identities by using fictitious names and addresses to register and operate their massive network of infringing Defendant Internet Stores. Defendants use privacy services that conceal the owners' identity and contact information. Upon information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed on Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are some of the common tactics used by Defendants to conceal their identities, the full scope and interworking of their massive infringement operation, and to avoid being shut down.

16. There are numerous similarities among the Defendant Internet Stores. For example, many of the Defendant Internet Stores have virtually identical layouts, even though different aliases were used to register the respective ecommerce store or online marketplace account. In addition, Infringing Products for sale by the Defendant Internet Stores bear similar irregularities and indicia

of infringing on one another, suggesting that Infringing Products were manufactured by and come from a common source and that, upon information and belief, Defendants are interrelated. The Defendant Internet Stores also include other notable common features, including use of the same and/or similar listing titles and naming conventions, check-out methods, lack of contact information, identically or similarly priced products and volume discounts, and the use of the same text and images.

17. Additionally, the Defendant Internet Stores utilize nearly-identical evasion techniques to avoid enforcement efforts – efforts which include, but are not limited to subscribing to and reviewing online chat platforms and groups, and monitoring copyright infringement litigation alert websites. Other tactics include registering new online marketplace accounts under new aliases once they receive notice of a lawsuit. Infringers, like the Defendants, also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection.

18. Infringers such as Defendants frequently operate multiple payment processor and merchant accounts as well as operating multiple credit card merchant accounts, hiding behind layers of payment gateways so that they can continue operation regardless of Plaintiff's enforcement efforts. Upon information and belief, the Defendants hold most of their assets in offshore accounts, making it easy to hide or dispose of assets, which will render an accounting by Plaintiff meaningless.

19. Plaintiff does not yet know the full extent and identity of the channels through which Defendants source and sell the Infringing Products. Defendants directed, supervised, and/or controlled activity infringing on Plaintiff's PM Copyrights and the sale of Infringing Products.

Defendants have a direct financial interest in the infringing activity and realize profits from the sale of Infringing Products. In addition to directly organizing and effectuating such infringing activities, each Defendant also induced, caused, and materially contributed to infringing conduct by others, including the other Defendants. There is a causal relationship between the infringing activity and the financial benefit reaped by Defendants.

20. Monetary damages alone cannot adequately compensate Plaintiff for ongoing infringement because monetary damages fail to address the loss of control of and damage to Plaintiff's reputation and goodwill; and any such monetary damages are difficult, if not impossible, to assess and/or quantify.

21. Plaintiff's goodwill and reputation are irreparably damaged by the making, using, offering for sale, selling, and/or importing of infringing products. Consumer brand confidence is also damaged, which results in a loss of future sales and market share. The extent of this harm to the brand and the diversion of customers due to loss in brand confidence are largely unquantifiable.

22. Plaintiff is further irreparably harmed as the infringers take away its ability to control the quality of the Infringing Products. Infringers who manufacture, distribute, sell, offer for sale, and/or import Infringing Products of low quality. Consumers who do not realize that they have purchased Infringing Products mistakenly associate Plaintiff with inferior quality which further irreparably harms Plaintiff's reputation and brand confidence, which is neither calculable nor precisely compensable.

23. Further irreparable harm is caused by the unauthorized use of the PM Copyrights by the Defendants, as it takes away Plaintiff's ability to control the marketing, distribution, and exclusivity of the PM Products. This loss of control and effect on brand reputation is largely

unquantifiable. The PM Copyrights and PM Products are meant to be exclusively used by Plaintiff. The marketing and distribution of PM Products are aimed at growing and sustaining sales. When infringers use the PM Copyrights without authorization, the exclusivity of PM Products, and Plaintiff's reputation, are damaged and eroded, resulting in a loss of unquantifiable future sales.

24. Defendants' infringement deprives Plaintiff of the ability to control the content and products associated with its intellectual property, devalues authentic PM Products, and undermines the value of the PM Copyrights by creating the impression that infringement may be undertaken with impunity, thereby threatening Plaintiff's ability to develop future licensees relationships.

25. Plaintiff will suffer immediate and irreparable injury, loss, or damage if an *ex parte* Temporary Restraining Order is not issued in accordance with Federal Rule of Civil Procedure 65(b)(1).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 10, 2025.

Signed: _____
Weston Spencer
Owner
Salt City Steel LLC